**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| Paradise IP LLC, | Civil Action No. 6:20-CV-999-ADA |
| Plaintiff, | Patent Case |
| v. | |
| J2 Global Inc., | **Jury Trial Requested** |
| Defendant. | |

**DEFENDANT J2 GLOBAL INC.'S MOTION TO DISMISS THE FIRST AMENDED**
**COMPLAINT FOR FAILURE TO STATE A CLAIM AND**
**PATENT INELIGIBILITY UNDER 35 U.S.C. § 101**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.    LEGAL STANDARDS ............................................................................................... 2

    A.    Pleading Direct Infringement of Method Claims ................................................ 2

    B.    Pleading Contributory or Induced Infringement.................................................. 2

    C.    Patent Eligibility Under Section 101 .................................................................. 3

           2.    Paradise's Claims for Divided Infringement by J2 Global and SugarSync Customers Should Be Dismissed with Prejudice. ................... 4

           3.    Paradise Fails to Plead Indirect Infringement. ........................................... 5

    B.    The Asserted Claims of the '627 Patent Are Ineligible Under Section 101 ........... 7

           1.    *Alice* Step 1: Claim 27 is directed to an abstract idea. .............................. 7

           2.    *Alice* Step 2: Claim 27 is not inventive. .................................................. 8

           3.    The asserted dependent claims are also patent-ineligible. ........................ 10

           4.    The Amended Complaint's boilerplate and conclusory language fails to address or cure the inventiveness issue under Section 101 ........... 11

    C.    The Asserted Claims of the '613 Patent Are Ineligible Under Section 101 .......... 12

           1.    *Alice* Step 1: Claim 1 is directed to abstract ideas. .................................. 13

           2.    *Alice* Step Two: Claim 1 is not inventive. ................................................ 16

           3.    Asserted dependent claim 6 is also patent-ineligible. .............................. 17

           4.    The Amended Complaint's Boilerplate and Conclusory Language Fails to Address or Cure the Inventiveness Issue Under Section 101. ................................................................................................ 18

    D.    The Asserted Claim of the '741 Patent Is Ineligible Under Section 101 ............. 19

           1.    *Alice* Step 1: Claim 1 is directed to an abstract idea. ............................... 20

           2.    *Alice* Step 2: Claim 1 is not inventive. .................................................... 20

           3.    The Amended Complaint's boilerplate and conclusory language fails to address or cure the inventiveness issue under Section 101 ........... 22

IV.    CONCLUSION ......................................................................................................... 23

## I.     INTRODUCTION

On October 28, 2020, Paradise IP LLC ("Paradise") filed a complaint against J2 Global, Inc. alleging infringement of: (1) claims 27, 28, and 31 of U.S. Patent No. 6,226,627; (2) claims 1 and 6 of U.S. Patent No. 7,200,613; (3) claim 1 of U.S. Patent No. 7,791,741; and (4) claim 6 of U.S. Patent No. 7,941,486.  All asserted claims are method claims and all asserted patents expired before Paradise filed its Complaint.  J2 filed a Motion to Dismiss on December 21, 2020, on the grounds that (1) Paradise did not have standing with respect to the '486 patent due to their **never having owned it**; (2) Paradise failed to adequately plead infringement by SugarSync's customers; and (3) the asserted patents are ineligible under 35 U.S.C. § 101.  In response, Paradise filed an Amended Complaint for Patent Infringement on January 11, 2021.[1]  Paradise did not dispute that it asserted infringement of a patent that it did not own (the '486 Patent), and its Amended Complaint no longer seeks to assert that patent.  Paradise's Amended Complaint continues to assert the remaining three patents but fails to address the deficiencies J2 Global previously identified in the Complaint.

The Court should grant this motion and dismiss the Amended Complaint ("Complaint") for two reasons.  *First*, the Complaint largely fails to state a claim for infringement of the asserted method claims.  *Second*, the asserted patents are directed to unpatentable subject matter and are invalid under 35 U.S.C. § 101.

---

[1] J2 Global also pointed out that Paradise sued the wrong party.  The accused SugarSync instrumentality is not provided by J2 Global, but rather by J2 Global's operating subsidiary, KeepItSafe, Inc.  Although J2 Global raised this issue in its prior motion, Paradise's Amended Complaint fails to address the issue.

## II.    LEGAL STANDARDS

### A.    Pleading Direct Infringement of Method Claims

"Where . . . the asserted patent claims are method claims, the sale of a product, without more, does not infringe the patent." *See Meyer Intellectual Props. Ltd. v. Bodum*, Inc., 690 F.3d 1354, 1366 (Fed. Cir. 2012).  "Instead, direct infringement of a method claim requires a showing that every step of the claimed method has been practiced." *Id.*

"Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).  An entity may be held responsible for others' performance of method steps in two sets of circumstances: "(1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Id.*  To determine whether an entity directs or controls others' performance, courts look to general principles of vicarious liability.  *Id.*  An actor is liable for infringement if they act through an agent or contract with another to perform one or more steps of a claimed method. *Id.*  Similarly, an actor may be liable when they "condition[] participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establish[] the manner or timing of that performance." *Id.*

### B.    Pleading Contributory or Induced Infringement

"A complaint satisfies the elements of contributory infringement by alleging that: (1) defendant had knowledge of the patent; (2) defendant sold products especially made for infringing use; (3) defendant had knowledge of the infringing use; (4) the products had no substantial noninfringing use; and (5) there exists an underlying act of direct infringement." *Parity Networks, LLC v. Cisco Sys., Inc.*, No. 6:19-CV-00207-ADA, 2019 WL 3940952, at *2 (W.D. Tex. July 26, 2019) (internal quotations and citations omitted).

To plead a claim for induced infringement, a plaintiff must show that (1) there has been direct infringement, (2) the alleged infringer knowingly induced infringement, and (3) the alleged infringer possessed the specific intent to encourage another's infringement. 35 U.S.C. § 271(b); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).  The "knowingly induced" element requires a plaintiff to plead both knowledge of the patent and that the alleged infringer knew that the induced acts constituted patent infringement.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

### C.     Patent Eligibility Under Section 101

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) sets the framework for determining patent eligibility under 35 U.S.C. § 101.  The Supreme Court established a two-part test to determine eligibility.  First, the court must determine "whether the claims at issue are directed to one of those patent-ineligible concepts," such as an abstract idea.  *Id.* at 217.  Second, if the claims are directed to an abstract idea, the court must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Id.* at 221.  An "inventive concept" includes an element or combination of elements that "is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* at 217.

The first step of the *Alice* inquiry examines "the focus of the claims, their character as a whole."  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  The second step, on the other hand, requires the court to "look[] more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, they identify an 'inventive concept' in the application of the ineligible matter to which (by assumption at step two) the claim is directed."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

### III.     ARGUMENT

#### A.     <u>Paradise Largely Fails to Plead Infringement of the Asserted Method Claims</u>

##### 1.     Paradise's Allegations of Direct Infringement of Method Claims by J2 Global Based on Sales or Offers to Sell the Accused Product Should Be Dismissed with Prejudice.

Paradise's allegations of infringement by J2 Global include allegations that J2 Global

sold or offered to sell the accused product:

> 25. Direct Infringement. Defendant has been and continues to directly infringe one or more claims of the '627 Patent in at least this District by making, using, ***offering to sell, selling and/or importing***, without limitation, at least the Defendant products identified in the charts incorporated into this Count below . . . that infringe at least the exemplary claims of the '627 Patent also identified in the charts incorporated into this Count below . . . literally or by the doctrine of equivalents. On information and belief, numerous other devices that infringe the claims of the '627 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

*See* Dkt. No. 16, ¶25 (emphasis added).  Similar allegations are pleaded for the '613 and '741

Patents in paragraphs 31 and 37 respectively.

Paradise's allegations of infringement based on alleged sales, offers to sell products, and

importing products, fail as a matter of law because the sale, offer of sale, or importing of a

product cannot constitute direct infringement of method claims.  *See Meyer Intellectual Props.*

*Ltd. v. Bodum*, Inc., 690 F.3d 1354, 1366 (Fed. Cir. 2012) ("Where . . . the asserted patent claims

are method claims, the sale of a product, without more, does not infringe the patent."); *Ricoh*

*Co., Ltd. v. Quanta Comp. Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008); *Cf. Lucent Techs., Inc. v.*

*Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) ("To infringe a method claim, a person

must have practiced all steps of the claimed method.").

##### 2.     Paradise's Claims for Divided Infringement by J2 Global and SugarSync Customers Should Be Dismissed with Prejudice.

Divided infringement requires pleading either that the defendant directs or controls

others' performance, or that the defendant and the other actor form a joint enterprise." *Akamai*, 797 F.3d at 1022.

Paragraphs 25, 31, and 37 of the Amended Complaint contain allegation of purported divided infringement by J2 Global and SugarSync customers. *See* Dkt. No. 16, ¶¶25, 31, 37 ("On information and belief, numerous other devices that infringe the claims of the [asserted patent] have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.").

Paradise fails to state a claim for divided infringement, however, as Paradise makes no allegations of J2 Global directing or controlling SugarSync customers, or of J2 Global and SugarSync customers acting as a joint enterprise. *See Akamai*, 797 F.3d at 1022.

J2 Global raised the same issue in its Motion to Dismiss Paradise's Complaint, but Paradise failed to address this deficiency in its Amended Pleading. Accordingly, to the extent Paradise's claims of direct infringement are premised on divided infringement by J2 Global and SugarSync customers (who are not named as defendants), the claims should be dismissed with prejudice.

### 3. Paradise Fails to Plead Indirect Infringement.

Paradise's Amended Complaint never explicitly alleges induced infringement or contributory infringement. However, Paradise does allege that "[o]n information and belief, numerous other devices that infringe the claims of the [asserted patent] have been made, used, sold, imported, and offered for sale by Defendant and/or its customers." *See* Dkt. No. 16, ¶¶25, 31, 37.

To the extent Paradise's Amended Complaint seeks to claim induced or contributory infringement by J2 Global, this vague and conclusory allegation in the Amended Complaint is wholly insufficient, as it addresses virtually none of the required elements of the claim. For

example, Paradise fails to plead J2 Global's knowledge of the asserted patents. *Castlemorton Wireless, LLC v. Bose Corp.*, Case No. 6:20-CV-00029-ADA, 2020 WL 6578418, at \*5 (W.D. Tex. Jul. 20, 2020) ("[L]iability for inducing patent infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'") (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015)); *Parity Networks, LLC v. Cisco Sys., Inc.*, No. 6:19-CV-00207-ADA, 2019 WL 3940952, at \*2 (W.D. Tex. July 26, 2019) ("A complaint satisfies the elements of contributory infringement by alleging that: (1) defendant had knowledge of the patent . . . .").

Although J2 Global raised this issue in its Motion to Dismiss Paradise's Complaint, Paradise's Amended Complaint *still* does not allege pre-suit knowledge, and therefore there can be no pre-suit indirect infringement. *See Castlemorton*, 2020 WL 6578418, at \*5 ("Because Castlemorton's complaint does not plead any facts that would support an allegation of pre-suit knowledge, the Court GRANTS Bose's motion to dismiss Castlemorton's indirect infringement claims.") (emphasis added).

Moreover, all asserted patents expired before the filing of the Complaint, meaning there can be no claim for post-suit infringement. Paradise served the Complaint on October 30, 2020. The '627 Patent expired April 17, 2018 (twenty years after its filing date of April 17, 1998). Dkt. No. 1-1. The remaining two patents expired before filing due to non-payment of maintenance fees: the '613 Patent expired April 3, 2019; and the '741 Patent expired Sept 7, 2018.

J2 Global raised these same issues in its Motion to Dismiss the Complaint, and Paradise failed to address them. As Paradise has already had an opportunity to amend and failed to remedy the deficiencies identified by J2, Paradise's indirect infringement claims should be

dismissed with prejudice.

**B.      The Asserted Claims of the '627 Patent Are Ineligible Under Section 101**

Asserted claims 27, 28, and 31 of the '627 Patent are invalid because the claims are each

drawn to the abstract idea of responding to a change by taking an action.  Independent claim 27

is illustrative:

> 27[a]. A method for constructing a software system, comprising:
>
> > [27b] defining a plurality of actions;
> >
> > [27c] defining a set of storage locations, each storage location having a storage value and at least one associated attribute value;
> >
> > [27d] associating, for each action, at least two of the plurality of storage locations with that action; and
> >
> > [27e] generating a selection rule.

### 1.      *Alice* Step 1: Claim 27 is directed to an abstract idea.

"The purely functional nature of [a] claim confirms that it is directed to an abstract idea,

not to a concrete embodiment of that idea."  *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838

F.3d 1266, 1269 (Fed. Cir. 2016) ("*Affinity Labs II*").

Here, claim 27 of the '627 Patent is purely functional in nature and directed to the

abstract idea of taking an action in response to change or new input.  Instead of solving a

technological problem, the '627 Patent recycles an old idea of responding to a change by taking

an action.  The concept of doing so is as old as humanity.  Humans have long learned to take an

action or a series of actions when new input arrives and have designed computer software to do

the same.  By 1991, at least six full years before the filing date of the '627 Patent, software

systems could respond to problems (change) by modifying software configuration while running.

*Id.*, 2:8–15.  These and other advances are admitted in the '627 Patent's background section.  *Id.*,

1:32–3:6.

The '627 Patent attempts to obscure this with amorphous language.  Instead of "files," it uses "storage locations."  *Id.*, 25:35–37.  Instead of "time-stamp," it uses "associated attribute value."  *Id.*  And, instead of being limited to one type of application; it covers *any* action, hence all software.  *Id.*, 25:31–34.  Despite this obfuscation, the '627 Patent simply recycles and abstracts an old idea using software, and achieves nothing but preemption.

In addition to being impermissibly abstract, the '627 Patent offends Section 101 of the Patent Act because of its exclusionary nature.  *See Alice*, 572 U.S. at 216 ("upholding the patent 'would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea'") (quoting *Bilski v. Kappos*, 561 U.S. 611–612 (2010)).  Indeed, claim 27 purports to cover any software program or method that associates a plurality of *any* actions to two or more storage locations and makes a decision about which action to take, *regardless of whether it has anything to do with building dynamic software*.  In fact, claim 27 is so abstract that Plaintiff alleges it can read on cloud storage and software that synchronizes files across entirely different devices, even though the '627 Patent does not even mention, much less disclose, anything regarding file synchronization across different devices.

### 2.     *Alice* Step 2: Claim 27 is not inventive.

The elements of claim 27, when considered individually or as an ordered combination, exhibit no inventive concept.  Claim 27 does not recite any particular hardware or software.  In fact, the specification states the system "is preferably implemented using a programmed general purpose computer."  '627 Pat., 5:30–31.  Additionally, the storage or memory device is preferably implemented using generic static or dynamic RAM.  *Id.*, 5:43–46.  In other words, the patent simply directs someone to take the abstract idea, implement it in software, and run it on a generic "general purpose" computer.  *See Alice*, 572 U.S. at 223–225 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional

feature[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'") (quoting *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. 66, 77–78 (2012) (alterations in original)); *see also Clear with Computers v. Altec Indus. Inc.*, Case No. 6:14-cv-79 (E.D. Tex.) (Mar. 3, 2015) ("A general purpose computer with minimal programming can perform functions "automatically" and "dynamically," and implementation of an abstract idea on such a computer is not an inventive concept.").

Every limitation of claim 27 recites generic, functional limitations, thereby again reducing the claim to nothing more than a high level of abstraction.  The patent claims "defining a plurality of actions," "defining a set of storage locations . . . ," "associating, for each action, at least two of the plurality of storage locations with that action," and "generating a selection rule." '627 Patent at claim 27.  Nowhere does the claim recite "*how* the desired result is achieved"—a critical part of the "inventive concept" analysis.  *Elec. Power Grp.*, 830 F.3d at 1355.

Moreover, there is no "technological problem" that is solved by the purported invention of claim 27.  *See Alice*, 573 U.S. at 223. According to the '627 Patent, the problem that the inventor purported to solve is the need for building "software that tolerates outside interference and supports dynamic reconfiguration."  '627 Pat., 1:11–13.  But claim 27 does not recite such a purpose in its preamble; instead, it only recycles an old, already-known idea.

Indeed, each limitation of claim 27 remains abstract and general: defining a plurality of actions and storage locations with associated attribute values (*see* claim limitations [27b] and [27c]), associating an action with two storage locations (*see* claim limitations [27d]), and having software decide what actions to take based on a selection rule (*see* claim limitations [27e]).  *See Affinity Labs II*, 838 F.3d at 1269 ("At that level of generality, the claims do no more than

describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.  The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea.").  Claim 27 is not patent-eligible.

### 3. The asserted dependent claims are also patent-ineligible.

Asserted dependent claims 28 and 31 do not include an inventive concept sufficient to support patent eligibility under *Alice* step two.

> 28. The method of claim 27, wherein the attribute value is a time-stamp representing a time when the storage location was last updated.

> 31. The method of claim 27, wherein generating the selection rule comprises generating a preference relation.

Claim 28 requires the "attribute value" to be a time-stamp representing a time when the storage location was last updated.  Unsurprisingly, the '626 Patent's background section admits that it did not invent time-stamps.  '627 Pat., 1:39–43.  Therefore, that limitation does not change the focus of the claim away from the abstract idea or introduce an inventive concept that covers more than the abstract idea.  *See Semantic Search Techs. LLC v. Aldo U.S. Inc.*, Case No. 6:16-cv-01058-RWS at 20–21 (E.D. Tex.) (Aug. 21, 2020) (finding the GUI limitation does not alter the patent eligibility determination because plaintiff acknowledges it did not invent the GUI and does not explain how the technology or arrangement is non-conventional).

Claim 31 also does not introduce an inventive concept that covers more than the abstract idea.  The '627 Patent explains that "[i]nstead of a random selection rule, the preferred embodiment of this invention uses as the selection rule *a preference relation that specifies which of any two actions is to be preferred over the other.*" '627 Pat., 8:11–15.  The "preference relation" of claim 31, then, simply specifies which of two actions is preferred over the other and

is not inventive because it merely chooses one action over another—an abstract idea without any inventive concept.

        **4.**      **The Amended Complaint's boilerplate and conclusory language fails to address or cure the inventiveness issue under Section 101.**

In the Amended Complaint, Paradise attempts to gloss over the vague functional descriptions in the asserted patents.  *See* Dkt. No. 16, ¶¶14-16 ("Conventional methods of constructing software systems fail to adequately address the problems incurred by rigid instruction sequencing . . . . The claimed invention addresses this problem by 'using a data driven optimization calculation to keep track of a complex set of components . . . .' In sum, 'this invention combine[s] the benefits of time-stamps, e.g., invariance to outside interference, with the benefits of general-purpose control structures embodied in the dependency action system of this invention.'").  The additional language, however, amounts to nothing more than boilerplate and conclusory legal opinion; at best, it simply attempts to re-describe what is in the specifications of the asserted patents.  Courts including the Federal Circuit have held that improvements must be captured in the claims, and furthermore that unsupported conclusions and unwarranted inferences need not be accepted as true.  *See, e.g.*, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369-70 (Fed. Cir. 2018) (improvements must be "captured in the claims").  The added chart in Paragraph 21 of the Amended Complaint merely reproduces the claim as stated, without argument beyond a conclusory statement that the patent "provides technical and unconventional solutions to problems in the prior art, thereby embodying inventive concepts," as well.  *See* Dkt. No. 16, ¶21.  In this case, the Amended Complaint makes no attempt to make factual allegations that claim is inventive beyond simply stating it to be so in broad, functional, and conclusory language, without explaining how to achieve the results or describing technological solutions.  Accordingly, Paradise's new allegations in the Amended Complaint  fail to address the

ineligibility of the asserted claims under Section 101.

C.      **The Asserted Claims of the '613 Patent Are Ineligible Under Section 101**

The '613 Patent, entitled "Asset Management System for Network-Based and Non-Network-Based Assets and Information," describes an "asset management system," that is directed to the abstract concepts of (1) using a database to collect and keep records, where (2) collecting records may be performed via data transfer between devices.  '613 Pat., 1:15–18.

Asserted claim 1 provides:

> 1[a]. A method of retaining data about a plurality of assets in an effectively single database controlled by a computer, the assets including network assets and non-network assets, the data including network data and non-network data, the network data being obtainable over a network, comprising:
>
> [1b] for each asset, associating the asset with a file in the database, the file including spaces for holding data, each space being associated with a type of data;
>
> [1c] discovering a network asset, the network asset having a network address associated therewith;
>
> [1d] as a result of discovering the network asset, creating a file and populating at least one predetermined space in the file with network data relating to the network asset;
>
> [1e] inferring non-network data related to the network asset and populating at least one predetermined space in the file with the inferred non-network data relating to the network asset, the non-network data including data relating to at least one of a physical location of the asset, a person associated with the asset, a warranty associated with the asset, and a lease associated with the asset; and
>
> [1f] for a non-network asset, associating the non-network asset with a file and populating a space in the associated file with non-network data.

Here, claim limitations [1b] and [1f] (as labeled *supra*) describe the process of creating a file to keep a record in a database from 1[a] for asset information to be stored in the database. [1c], [1d], and [1e] describe the process of finding asset information via data transfer over a network and deciding what records to keep in the database.

-12-

For the reasons described below, the asserted claims of the '613 Patent are not patent-eligible under Section 101.

### 1.    *Alice* **Step 1: Claim 1 is directed to abstract ideas.**

The Federal Circuit has held that concepts such as "using categories to organize, store, and transmit information" and "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" are abstract.  *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014); *Cyberfone Sys., LLC v. CNN Interactive Grp.*, 558 Fed. App'x 988, 991–92 (Fed. Cir. 2014) (finding claim that "recites the steps of (1) 'obtaining data transaction . . . '; (2) 'forming a plurality of different exploded data transactions . . . '; and (3) 'sending said different exploded data transactions . . . '; . . . involves an abstract idea, as in *Bilski*, . . . [of] using categories to organize, store, and transmit information . . . .").

Asserted claim 1 of the '613 Patent is similarly directed to the abstract idea of using a database for asset management.  Claim 1 specifies a "method of retaining data about a plurality of assets in an effectively single database controlled by a computer" where both "network and non-network asset" data is stored, and "network data [is] obtainable over a network."  The '613 Patent explains that the object of the invention was to "function[] as an 'asset manager' for a large population of items or assets."  '613 Pat., Abs.  The specification describes gathering "relevant data . . . over the network and enter[ing] into the database" for "'network' assets which are capable of electronically communicating data about themselves, such as computers and digital printers."  *Id.*  "For 'non-network' assets . . . information is gathered into the database by other means."  *Id*.  As these passages show, the applicants themselves understood the alleged invention to be directed to collecting data (about assets) and storing that data in a memory, akin to *Cyberfone.*

The fact that the claims have close, non-technological analogues also supports the conclusion that it is directed to an abstract idea.  The underlying practice of asset management is something humans can and did do without computers.  For example, a person could, without the use of any computer, (i) receive information about an asset (or look at an asset for information, (ii) infer and decide what information should be stored (including the conventional inferences described in the claims, such as where the asset is, who should be associated with the asset, or whether there is a lease or warranty associated with the asset), (iii) using pen and paper, write down the relevant information to be stored, and (iv) file that piece of paper into an organized file cabinet.  Indeed, the patent itself notes that the alleged invention can also be used to track "typewriters, calculators, and postage meters, as well as things which are not even electrical, such as desks and cabinets."  *Id*. at 3:30–32.  Managing inventory of desks and cabinets is a task that can (and has long been) performed by humans without the aid of computers, underscoring that the '613 Patent is directed to an abstract idea.  *See Mortg. Grader, Inc. v. First Choice Loan Services, Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (explaining that a claimed process was abstract when the underlying steps "could all be performed by humans without a computer").

The claim limitations that are focused on how this information is collected and entered do not change the analysis because they only add other abstract concepts.  And although the claims specifically recited physical, Bluetooth-enabled devices, the Federal Circuit has also found the idea of "capturing and transmitting data between devices from one device to another" to be abstract.  *Cellspin Soft. Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019).[2]  That the '613

---

[2]     Importantly, the Federal Circuit's decision **postdates** numerous decisions recognizing the patent eligibility of inventions that improve computer functionality, such as *DDR*

Patent relies on a second abstract concept to capture/transmit data between devices (in order to add that data to a database) does not change the analysis under the first step of *Alice* because "[a]dding one abstract idea [] to another abstract idea [] does not render the claim non-abstract." *RecogniCorp, v. Nintendo Co. Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *see also Elec. Power*, 830 F.3d at 1354 (finding claims abstract when focused on a combination of several abstract processes).

The asserted claim is unlike the claims found eligible in *Enfish*, because the asserted claim is not directed to "an improvement to computer functionality itself." 822 F.3d 1327, 1336 (Fed. Cir. 2016). Indeed, nowhere does the patent specification suggest a new and improved database; the applicants themselves admitted that "the present application relates to an 'asset management system' in which information about a large population of assets of many different types, such as office equipment and furniture, can be gathered and managed." '613 Pat., 1:15–18. The discovery of data over the network is likewise absent of any mention of improvements to computer functionality, instead only relying on gathering information over a network if such generically-described assets are "network assets" that can be "discover[ed]." *Id.* at cl. 1. In other words, the '613 Patent uses broad functional language and generic tools to address the non-technological challenge of gathering and storing data. The '613 Patent is therefore, directed to an abstract idea. *See RecogniCorp*, 855 F.3d at 1327 (invalidating claims for carrying out an abstract process "for which computers are invoked merely as a tool") (citations omitted).

---

*Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014), *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016), and *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350–51 (Fed. Cir. 2016).

## 2.   *Alice* Step Two: Claim 1 is not inventive.

In *Broadband iTV, Inc. v. Hawaiian Telcom, Inc.*, 136 F.Supp.3d 1228 (D. Haw. 2015), *aff'd* 669 F. App'x 555 (Fed. Cir. 2016), the district court found (and the Federal Circuit affirmed) that using "conventional computers and the Internet to automate, as a combined set of steps, the implementation of an abstract idea that can be completed manually" was an abstract idea that lacked an inventive concept under the second step of *Alice*. *Broadband iTV*, 136 F. Supp. 3d at 1245.

Claim 1 of the '613 Patent provides no reason to depart from the same conclusion reached in *Broadband iTV*. Like the claims in *Broadband iTV*, claim 1 recites conventional processes and requires well-known components and functionalities. The recited hardware elements are entirely generic (a "computer," "network assets," and "non-network assets"). The specification's examples of such assets consist only of generically-described existing conventional components, including printers, copiers, facsimile machines, and desks and tables. There appear to be no limitations on the computer beyond it presumably needing network access (a conventional feature in and of itself). These claim elements are even more broad than the "[s]pecific-sounding language regarding conventional computer components' function" contemplated in *Broadband iTV*, 136 F. Supp. 3d at 1243 (internal quotes omitted).

The claimed process also requires no novel or unconventional functionality. As above, the claim limitations do not provide for the central computer needing any sort of specialized function (beyond the presumed network access, which was a well-known feature of many computers even back in 2002).

Nor is there anything inventive to be found in claim limitations that call for discovering network assets and inferring and populating network data for network-assets in a database, or populating non-network data for non-network assets. "Ping" as a command to discover network

information about networked devices has been around since the beginning of networking, and any office worker over the last couple of decades can attest that entering data about things into a computer database is a conventional process.  *See OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (ruling that limitations claiming use of computers to automate a previously-manual process provided no inventive concept).  Thus, like the steps for managing assets in a database, the claim limitations directed to discovering network asset data and populating the database with said data cannot provide the inventive concept necessary to impart eligibility.  *See SAP Am.,* 898 F.3d at 1168–70 (finding no inventive concept when the allegedly inventive aspects were "themselves in the realm of abstract ideas").

Claim 1 describes no technical solutions to any technical problem that might go along with discovering information about assets or storing them in a database alongside non-network information.  Rather, the explanation of this alleged solution is purely functional: the patent explains that network data is merely "discovered" and "inferred," and stored in a database whose "assets include[e] network assets and non-network assets."  *See* '613 Pat., cl. 1.  These entirely functionally-described "database controlled by a computer" limitations do nothing to change the lack of eligibility.  *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 615 (Fed. Cir. 2016) (explaining that "vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention").

### 3.    Asserted dependent claim 6 is also patent-ineligible.

Asserted dependent claim 6 does not include an inventive concept sufficient to support patent eligibility under *Alice* step two.  Claim 6 reads:

> 6. The method of claim 1, wherein a type of data relates to an identity of a vendor of the asset.

Claim 6 simply specifies that the "type of data" relates to an identity of a vendor.  The

claim remains directed to the abstract idea of using a database to collect and keep records and

transfer data between devices, and it does not introduce an inventive concept that covers more

than the abstract idea.

>    **4.    The Amended Complaint's Boilerplate and Conclusory Language Fails
>           to Address or Cure the Inventiveness Issue Under Section 101.**

Similar to its arguments for the '627 Patent, in the Amended Complaint, Paradise

attempts to address the vague functional descriptions for the '613 Patent.  However, it again fails

to do more than address this with boilerplate, conclusory arguments.  *See* Dkt. No. 16, ¶18 ("The

claimed invention addresses the problem of managing assets, including those that lack network

communication capabilities with unconventional, technical solutions.  *Id.*, 2:32-44 ('According

to one aspect of the present invention, there is provided a method of retaining data about a

plurality of assets, the assets including network assets and non-network assets, the data including

network data and non-network data, the network data being obtainable over a network.  For each

asset, a file is associated with the asset, the file including spaces for holding data, each space

being associated with a type of data.  For a network asset, a space associated with a first type of

data in the associated file is populated with the network data.  For a non-network asset, the space

associated with the first type of data in the associated file is populated with non-network

data.')").

As above, this is nothing more than a statement that the solution is unconventional and

technical, along with a quote from the patent in broad, functional language without explaining

how to achieve the results or describing technological solutions as required.  The added chart in

Paragraph 22 of the Amended Complaint merely reproduces the claim as stated, without any

additional facts or argument beyond a bare statement that it "provides technical and

unconventional solutions to problems in the prior art, thereby embodying inventive concepts," as

well.  *See* Dkt. No. 16, ¶22.  Accordingly, this fails to address the ineligibility of the asserted claims under Section 101.

**D.    The Asserted Claim of the '741 Patent Is Ineligible Under Section 101**

Asserted claim 1 of the '741 Patent is invalid because the claim is drawn to the well-known abstract idea of collecting, analyzing, and storing data.  Claim 1 provides:

1[a]. A method for synchronizing a second process to a first process, wherein state data regarding input to and output of a model of the first process is available to the second process after a delay period, the method comprising:

[1b] **beginning a data collection** period;

[1c] receiving delayed state data points regarding the input to and output of the model by a controller of the second process;

[1d] storing the delayed state data points received during the data collection period;

[1e] **ending the data collection** period after receiving and storing delayed state data that represents the state of the input to and output of the model at a point in time after the beginning of the data collection period;

[1f] **determining a current state** of the model of the process based on at least some of the stored state data points and predetermined information regarding a behavior of the state of the model; and

[1g] **setting a current state** of the second process according to the determined current state of the model, thereby synchronizing the second process to the first process.

Claim limitations [1b] through [1e] are directed to "collecting data"—receiving data that reflects changes in a first process; limitation [1f] is directed to "analyzing data"—determining how the changes in the first process applies to the second process; and limitation [1g] is directed to "storing data"—updating or setting the current state of the second process.

As set forth further below, these limitations are directed to an abstract idea and contain no inventive concept.

### 1.   *Alice* Step 1: Claim 1 is directed to an abstract idea.

Claim 1 is directed to the abstract idea of collecting and analyzing data.  The Federal Circuit has held that the process of collecting and analyzing data, without more, is directed to an abstract idea.  *See Elec. Power Grp.*, 830 F.3d at 1354 ("[A] process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions . . . [is] directed to an abstract idea."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 613 ("Here, we find that, like the claims at issue in *Content Extraction* which were directed to 'collecting data,' 'recognizing certain data within the collected data set,' and 'storing the recognized data in memory,' . . . attaching classification data, such as dates and times . . . is a well-established 'basic concept' sufficient to fall under *Alice* step 1."); *Content Extraction*, 776 Fed 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions.").

Moreover, claim 1 carries a significant risk of preemption due to it being drawn to data collection and analysis.  *See First-Class Monitoring, LLC v. United Parcel Serv. of Am., Inc.*, Case No. 2:19-CV-00106-WCB at 16 (E.D. Tex.) (July 22, 2019) (finding "[t]he risk of preemption, which the Supreme Court has identified as a marker of an abstract idea, is significant" in a case drawn to the abstract idea of data collection, recognition, and storage).

### 2.   *Alice* Step 2: Claim 1 is not inventive.

Whether taken individually or as an ordered combination, the claim elements of "receiving delayed state data points," "storing the delayed state data points," "determining a current state of the model of the process," and "setting a current state of the second process" are purely functional and generic.  *See Affinity Labs II*, 838 F.3d at 1269 ("At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.  The

purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea.").  Nor is there anything inventive to be found in the claims that call for "receiving" data points, "storing" data points, and "determining" a current state, as they do not claim "*how* these results [are] achieved." *Elec. Power Grp.*, 830 F.3d at 1355 (emphasis in original).

Further, neither the claim nor the specification call for the abstract idea to be implemented on any particular hardware or software.  Although, according to the specification, the claimed distributed system may include a communication network for carrying communication between system elements, claim 1 does not recite a communication network. '741 Pat., 22:34–56.  Putting this aside, merely performing the abstract idea on a "communication network" is "not even arguably inventive."  *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).  Although a distributed system of the alleged invention may include elements such as actuators, sensors, controllers, coordinators, and high level elements, these are generalized into a "process model," "the model," or "model" of a "process" in the specification and the claims. *Id.*, 22:34–56.  And, although claim 1 calls for a controller, there are no specific requirements for the controller. *Id.*, 22:41–42.  Thus, nothing in the claim "requires anything other than conventional computer and network components operating according to their ordinary functions." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).  For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of "well understood, routine, [and] conventional activities previously known to the industry." *Content Extraction*, 776 F.3d at 1348 (quoting *Alice*, 573 U.S. at 225).  Here, it does not.

### 3. The Amended Complaint's boilerplate and conclusory language fails to address or cure the inventiveness issue under Section 101.

Similar to its arguments for the '627 Patent and '613 Patent, in the Amended Complaint, Paradise attempts to address the vague functional descriptions for the '741 Patent. However, it again fails to do more than add boilerplate, conclusory arguments. *See* Dkt. No. 16, ¶20 ("The claimed invention tackles this problem by providing 'systems and methods for synchronizing a second process to a first process in the face of communications delays.' *Id.*, 4:1-24. ('A method for synchronizing a second process to a first process, wherein state data regarding input to and output of a model of the first process is available to the second process after a delay period, can include beginning a data collection period, receiving delayed state data points regarding the input to and output of the model, storing the delayed state data points received during the data collection period, ending the data collection period after receiving and storing delayed state data that represents the state of the input to and output of the model at a point in time after the beginning of the data collection period and determining a current state of the model of the process based on at least some of the stored state data points and predetermined information regarding a behavior of the state of the model. Additionally, the method for synchronizing can include setting a current state of the second process according to the determined current state of the model, thereby synchronizing the second process to the first process.')").

As above, this is nothing more than a statement that the solution is provided by the patent, along with a quote from the patent in broad, functional language without explaining how to achieve the results or describing technological solutions as required. The added chart in paragraph 23 of the Amended Complaint merely reproduces the claim as stated, without facts or arguments beyond a boilerplate statement that the patent "provides technical and unconventional solutions to problems in the prior art, thereby embodying inventive concepts," as well. *See* Dkt.

No. 16, ¶23. Accordingly, this fails to address the ineligibility of the asserted claims under Section 101.

## IV.   CONCLUSION

For the reasons stated above, Defendant J2 Global respectfully requests that the Court dismiss the Amended Complaint with prejudice.

Respectfully submitted,

Dated: January 25, 2021

*/s/ Deron R. Dacus*

Deron R. Dacus
Texas Bar No. 00790553
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
903-705-1117 (phone)
903-581-2543 (fax)
E-mail: ddacus@dacusfirm.com

Harper Batts
Calif. Bar No. 242603 (*pro hac vice* pending)
Chris Ponder
Texas Bar No. 24065916 (*pro hac vice* pending)
Jeffrey Liang
Calif. Bar No. 281429 (*pro hac vice* pending)
SHEPPARD MULLIN
379 Lytton Ave.
Palo Alto, CA 94301
650-815-2673 (phone)
650-815-2601 (fax)
E-mail: hbatts@sheppardmullin.com
E-mail: cponder@sheppardmullin.com
E-mail: jliang@sheppardmullin.com

*Counsel for Defendant J2 Global, Inc.*

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on January 25, 2021, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/ Deron Dacus*
Deron Dacus