# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| **Paradise IP LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**J2 Global, Inc.,**<br><br>Defendant. | Case No. 6:20-CV-999-ADA<br><br>Patent Case<br><br>Jury Trial Demanded |

## Paradise's Opposition to J2's Motion to Dismiss

Dated:  February 4, 2021

Isaac Rabicoff
**Rabicoff Law LLC**
5680 King Centre Dr, Suite 645
Alexandria, VA 22315
(773) 669-4590
isaac@rabilaw.com

**Counsel for Plaintiff
Paradise IP LLC**

## TABLE OF CONTENTS

1. INTRODUCTION ..................................................................................................................1

2. LEGAL STANDARD FOR RULE 12(B)(6) MOTIONS ................................................................1

3. BACKGROUND....................................................................................................................2

3.1 The asserted claims of each patent address a specific problem in the prior art with technical and unconventional solutions, thereby embodying inventive concepts. ..............2

3.1.1 The '627 Patent. ....................................................................................................2

3.1.2 The '613 Patent. ....................................................................................................3

3.1.3 The '741 Patent. ....................................................................................................3

3.2 The claim language of each patent provides technical and unconventional solutions to problems in the prior art, thereby embodying inventive concepts......................................5

3.2.1 The '627 Patent. ....................................................................................................5

3.2.2 The '613 Patent .....................................................................................................5

3.2.3 The '741 Patent .....................................................................................................6

4. PARADISE HAS ADEQUATELY PLEAD INFRINGEMENT OF EACH PATENT ...............................7

4.1 J2 ignores or misunderstands pleading *in the alternative* with respect to direct infringement. .....................................................................................................................7

4.2 Paradise does not claim relief for indirect infringement in the operative complaint...........8

5. PARADISE'S CLAIMS PASS BOTH PRONGS OF *ALICE*, MAKING THEM PATENT ELIGIBLE UNDER SECTION 101 .....................................................................................................................8

5.1 Step One: Paradise's claims are patent-eligible subject matter. ..........................................9

5.1.1 J2's reading contorts the elements of the asserted claims of each patent, calling them abstract only by describing them at a high level of abstraction. ...........................9

5.2 *Alice* Step Two: Paradise's claims recite an inventive concept. ........................................10

5.2.1 Generating a path traversal without traditional maps, a key inventive concept, is captured in the claims and described in the specification................................................10

5.2.2 *Berkheimer* and *Cellspin* prohibit dismissal under Section 101 here, given the factual dispute over the unconventionality of the claimed techniques of each patent...................11

6. CONCLUSION....................................................................................................................13

TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018) .................................................................................... 12

*Alice Corp. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ................................................................................................. 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................... 1

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................... 1

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) .............................................................................. 11, 12

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    927 F.3d 1306 (Fed. Cir. 2019) .................................................................................. 12

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ................................................................................................... 10

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ........................... 10

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) .................................................................................... 9

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) .................................................................................... 10

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) .................................................................................. 10

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S. Ct. 1289 (2012) ................................................................................................. 9

*Microsoft Corp. v. i4i Ltd. Partnership*,
    131 S. Ct. 2238 (2011) ................................................................................................. 9

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ...................................................................................... 8

**1.     INTRODUCTION**

When evaluating J2's Motion, this Court should consider these key points:

- Paradise has adequately plead each count of infringement;

- The claim language of the asserted claims provide technical solutions to problems in the art;

- J2's reading contorts the language of the asserted claims, calling them abstract only by describing them at a high level of abstraction;

- Inventive concepts are captured in the claims and described in the specifications; and

- *Berkheimer* and *Cellspin* prohibit dismissal under Section 101 here, given the factual dispute over the unconventionality of the claimed techniques of each patent.

J2's Motion should be denied.

**2.     LEGAL STANDARD FOR RULE 12(B)(6) MOTIONS**

A motion to dismiss can succeed only when a complaint fails to state a plausible claim for relief, even where all well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

And the Supreme Court instructs that this plausibility requirement is not akin to a "probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal" that the defendant is liable for the alleged misconduct. *Twombly*, 550 U.S. at 556.

**3.   BACKGROUND**

**3.1   The asserted claims of each patent address a specific problem in the prior art with technical and unconventional solutions, thereby embodying inventive concepts.**

**3.1.1   The '627 Patent.**

Conventional methods of constructing software systems fail to adequately address the problems incurred by rigid instruction sequencing. '627 patent, 3:9-18 ("These conventional methods fail to adequately address the problems incurred by rigid instruction sequencing. Such methodologies employ commonly understood functionality such as branching, looping, backtracking, and non-determinism, i.e., multiple functional components that are applicable to compute the same variable. Yet these methods are generally incapable of adapting to failure of individual functions, changing environmental conditions, such as, for example, interferences, computational resources, failure of devices, or mistakes by human users.").

The claimed invention addresses this problem by "using a data driven optimization calculation to keep track of a complex set of components and to enable or disable the members of various sequences by a simple expedient is needed." *Id*., 3:19-46 ("This invention provides a method and apparatus for constructing and executing complex software. This invention further provides a method and apparatus that uses redundant sets of functional components to achieve robustness and fault tolerance. This invention also provides a method and apparatus employing a technique for composing functional components that tolerates outside interference and supports dynamic reconfiguration. This invention further provides a method and apparatus that achieves self-optimization through the use of learning and planning techniques. This invention provides a method and apparatus in which these features are realized through the use of time-stamps and appropriate execution rules.").

In sum, "this invention combine[s] the benefits of time-stamps, e.g., invariance to outside interference, with the benefits of general-purpose control structures embodied in the dependency action system of this invention." *Id.*, 3:44-46.

### 3.1.2   The '613 Patent.

Prior art networking systems were limited to network communications between conventional devices. The claimed invention, on the other hand, includes interoperating with assets that lack network communication capabilities: "a system for retaining information about a large set of not only electronic machines, but also any "assets" which may or may not have inherent network-communication capabilities. Such assets may include machines such as analog copiers, typewriters, and telephones; and may further include items such as desks and chairs." '613 patent, 1:44-50.

The claimed invention addresses the problem of managing assets, including those that lack network communication capabilities with unconventional, technical solutions. *Id.*, 2:32-44 ("According to one aspect of the present invention, there is provided a method of retaining data about a plurality of assets, the assets including network assets and non-network assets, the data including network data and non-network data, the network data being obtainable over a network. For each asset, a file is associated with the asset, the file including spaces for holding data, each space being associated with a type of data. For a network asset, a space associated with a first type of data in the associated file is populated with the network data. For a non-network asset, the space associated with the first type of data in the associated file is populated with non-network data.").

### 3.1.3   The '741 Patent.

As the processing demands for systems has increased over time, conventional systems have addressed this demand by making a single system more complex and increasing the number

of embedded processors. The specification highlights this problem of increasing system complexity and processors to address increasing processing demands: "However, as machines become more complex and contain larger numbers of embedded processors, instances of tightly coupled distributed control systems are becoming more common. In a tightly coupled system, controllers may interact through fast physical or informational coupling. That is, the actions of one controller may have an impact on an ability of a second controller to perform its function. Therefore, there is a desire for coordination and communication among the various controllers. One aspect of the coordination problem is how to synchronize a newly activated process or controller, which has been activated in order to address a particular portion of a process, to the status or state of the ongoing process in the face of communication delays." '741 patent, 3:63-67.

The claimed invention tackles this problem by providing "systems and methods for synchronizing a second process to a first process in the face of communications delays." *Id.,* 4:1-24. ("A method for synchronizing a second process to a first process, wherein state data regarding input to and output of a model of the first process is available to the second process after a delay period, can include beginning a data collection period, receiving delayed state data points regarding the input to and output of the model, storing the delayed state data points received during the data collection period, ending the data collection period after receiving and storing delayed state data that represents the state of the input to and output of the model at a point in time after the beginning of the data collection period and determining a current state of the model of the process based on at least some of the stored state data points and predetermined information regarding a behavior of the state of the model. Additionally, the method for synchronizing can include setting a current state of the second process according to the

determined current state of the model, thereby synchronizing the second process to the first process.").

### 3.2 The claim language of each patent provides technical and unconventional solutions to problems in the prior art, thereby embodying inventive concepts.

#### 3.2.1 The '627 Patent.

The exemplary asserted claims of this patent assert the following:

| Exemplary Asserted Claims of the '627 Patent |
|---|
| 27. A method for constructing a software system, comprising:<br><br>defining a plurality of actions;<br><br>defining a set of storage locations, each storage location having a storage value and at least one associated attribute value;<br><br>associating, for each action, at least two of the plurality of storage locations with that action; and<br><br>generating a selection rule.<br><br><br>28. The method of claim 27, wherein the attribute value is a time-stamp representing a time when the storage location was last updated.<br><br><br>31. The method of claim 27, wherein generating the selection rule comprises generating a preference relation. |

#### 3.2.2 The '613 Patent

The exemplary asserted claims of this patent assert the following:

| Exemplary Asserted Claims of the '613 Patent |
|---|
| 1. A method of retaining data about a plurality of assets in an effectively single database controlled by a computer, the assets including network assets and non-network assets, the |

data including network data and non-network data, the network data being obtainable over a network, comprising:

for each asset, associating the asset with a file in the database, the file including spaces for holding data, each space being associated with a type of data;

discovering a network asset, the network asset having a network address associated therewith;

as a result of discovering the network asset, creating a file and populating at least one predetermined space in the file with network data relating to the network asset;

inferring non-network data related to the network asset and populating at least one predetermined space in the file with the inferred non-network data relating to the network asset, the non-network data including data relating to at least one of a physical location of the asset, a person associated with the asset, a warranty associated with the asset, and a lease associated with the asset; and

for a non-network asset, associating the non-network asset with a file and populating a space in the associated file with non-network data.

6. The method of claim 1, wherein a type of data relates to an identity of a vendor of the asset.

### 3.2.3   The '741 Patent

The exemplary asserted claims of this patent assert the following:

| Exemplary Asserted Claims of the '741 Patent |
| --- |
| 1. A method for synchronizing a second process to a first process, wherein state data regarding input to and output of a model of the first process is available to the second process after a delay period, the method comprising:<br><br>beginning a data collection period;<br><br>receiving delayed state data points regarding the input to and output of the model by a controller of the second process;<br><br>storing the delayed state data points received during the data collection period; |

> ending the data collection period after receiving and storing delayed state data that represents the state of the input to and output of the model at a point in time after the beginning of the data collection period;
>
> determining a current state of the model of the process based on at least some of the stored state data points and predetermined information regarding a behavior of the state of the model; and
>
> setting a current state of the second process according to the determined current state of the model, thereby synchronizing the second process to the first process.

**4. PARADISE HAS ADEQUATELY PLEAD INFRINGEMENT OF EACH PATENT**

**4.1 J2 ignores the claim charts incorporated as exhibits within the complaint.**

Paradise overlooks that the claim charts of each patent specifically accuse J2 of *practicing the method* of the asserted patents, providing specific factual support at each limitation. *See* Exhibits 4-6.

As such, Paradise's infringement theory does not rest merely upon J2's sale of the accused product. And the level detail explaining J2's infringement in the claim charts well exceeds the pleading requirements.

**4.2 Paradise has adequately plead both single actor and divided direct infringement.**

The pleadings and claim charts provide two avenues for direct infringement.

- J2's internal employee testing of the accused product (Amended Complaint, ¶¶ 26, 32, 38);

- The claims charts describe how users follow the required procedures J2's user guides in a manner that inevitably leads to infringement (Exhibits 4-6).

J2 is therefore liable for direct infringement, both through internal employee testing (single actor) and divided (in conjunction with customers) infringement theories.

### 4.3 Paradise does not claim relief for indirect infringement in the operative complaint.

Nowhere in the complaint does Paradise seek relief for indirect infringement. The words "indirect", "induced", or "contributory", or the like do not appear in the pleadings. J2 cannot request the dismissal of claims that are not raised by Paradise in the operative complaint.

### 5. PARADISE'S CLAIMS PASS BOTH PRONGS OF *ALICE*, MAKING THEM PATENT ELIGIBLE UNDER SECTION 101

Paradise's claims are patent eligible, because they satisfy the *Alice* test for patent eligibility under Section 101. Patent-eligible subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101 (1952). The judicially recognized exceptions from this provision are for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355.

First, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." ("*Alice* Step One"). *Id.* Otherwise, "the claims pass muster under § 101." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014). The relevant inquiry here is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).

Second, only if the claims at issue are directed to one of those patent-ineligible concepts, then the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim'

into a patent-eligible application" ("*Alice* Step Two"). *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1297 (2012)). This step asks whether the claims add an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal citations omitted).

J2 also bears the burden to prove the invalidity of Paradise's claims *with clear and convincing evidence*, which it cannot do. *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011).

### 5.1 Step One: Paradise's claims are patent-eligible subject matter.

#### 5.1.1 J2's reading contorts the elements of the asserted claims of each patent, calling them abstract only by describing them at a high level of abstraction.

J2 strips the claims of each patent of all limiting detail and inventive concepts by reducing them to nothing more than the following:

- ('627 Patent) "taking an action in response to change or new input" (Motion, 7);
- ('613 Patent) "using a database for asset management" (Motion, 13); and
- ('741 Patent) "collecting and analyzing data" (Motion, 20).

Comparing J2's abstracted summaries of the elements with those actual elements dispels the confusion. J2's summaries strip out the very limitations that *implement* the claimed invention and provide *inventive features*. *See generally*, § 3.

J2's reading of these claims in each patent therefore dilute and depart from the actual language, an approach to Section 101 analysis prohibited by the Federal Circuit. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to §101 swallow the rule."); *see also Diamond v. Diehr*, 450 U.S. 175, 189 n.12

(1981) (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious").

*Alice* Step One must be meaningful: this step often ends the inquiry. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *see also Enfish*, 822 F.3d at 1335; *see also Alice*, 134 S. Ct. at 2354 (noting that "we tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law"). Singling out individual steps to find a patent-ineligible concept does not demonstrate that the claims are abstract. *Enfish*, 822 F.3d at 1335.

Instead, a court must consider claims in light of the specification and find an abstract idea only when "their character *as a whole* is directed to excluded subject matter." *See id*. (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)) (emphasis added). When understood this way, none of the claims are abstract.

And since these technical solutions are captured in the claims and implemented in the specification with *limiting detail*— detail unaddressed by J2 —this case steers clear of the "purely functional" and the poorly described claims of *TLI*, among others. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016). *See* § 3 above.

The asserted claims in each patent are therefore non-abstract and patent eligible at *Alice* Step One.

### 5.2 *Alice* Step Two: Paradise's claims recite an inventive concept.

#### 5.2.1 Inventive concepts are captured in the claims and described in the specifications of each patent.

Even if this Court finds that Paradise's claims are directed to an abstract idea, the claims would still fall within the realm of an inventive concept post-*Alice*.

The claims of each patent embody inventive concepts:

- **'627 Patent**. The claims here overcome the problem of rigid instruction sequencing and unrecoverable failures within that sequence. By employing data-driven optimizations, a complex set of components can be enabled or disable members within a sequence—allowing for adaptive recovery or prevention of software or system failures. *See* § 3.1.1.

- **'613 Patent**. The claims address the problem of managing assets, including those that lack network communication capabilities with an unconventional solution. The implementation of this technique is technically described in the specification. '613 Patent, 2:32-44 ("For each asset, a file is associated with the asset, the file including spaces for holding data, each space being associated with a type of data. For a network asset, a space associated with a first type of data in the associated file is populated with the network data. For a non-network asset, the space associated with the first type of data in the associated file is populated with non-network data."); *see also* § 3.1.2.

- **'741 Patent**. The claims here tackle the problem of handling increasing processing demands without making a single system more complex and increasing the number of embedded processors. The claims overcome this problem of distributed computing by synchronizing a second process to a first process in the face of communications delays. *See* § 3.1.3.

Given that all non-conclusory allegations—including the allegations of an inventive concept embodied in the claims—must be accepted as true at the pleadings stage, this Court should deny J2's Motion.

### 5.2.2 *Berkheimer* and *Cellspin* prohibit dismissal under Section 101 here, given the factual dispute over the unconventionality of the claimed techniques of each patent.

The claims of each patent describe inventive features that require a factual determination about their unconventionality: "inventive feature[s] . . . to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). Summary judgment—let alone Rule 12(b)(6) dismissal—is "improper" because "whether the claimed invention is well-understood, routine, and conventional is an underlying fact question for which [the defendant] offered no evidence." Id. at 1370.

On many occasions, J2 provides expert-like opinion about the conventionality of these specifically claimed techniques—and doing so without *technical* support (since extrinsic evidence is not permitted at this stage).

Besides stripping out key inventive limitations from its analysis and ignoring the ordered combination of elements, J2 opines about conventionality more like an expert over issues of fact than an attorney over issues of law.

What's more, to demonstrate conventionality with *clear and convincing evidence*, J2 must go beyond even showing that prior art merely discloses all elements of the claims (which it cannot do):

| **Mere disclosure of a concept in the prior art does not render it conventional** |
| --- |
| "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination. **Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art**. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." (*Berkheimer*, 881 F.3d at 1368; emphasis added.) |

And the claim charts, incorporated in the complaint, provides "concrete allegations . . . that individual elements and the claimed combination are not well-understood, routine, or conventional activity." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

And given that the claims of each patent embody inventive concepts, the specifications need not explicitly identify these features as unconventional. *See Cellspin Soft, Inc. v. Fitbit, Inc.*, 2019 U.S. App. LEXIS 18853, 18876 (Fed. Cir. 2019). ("As long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why

this claimed structure is unconventional."); *see also* § 3.2 (the specifications do describe core features of the claims as unconventional—if not explicitly in each case, then implicitly).

This dilemma demonstrates the peril of rendering a final decision on conventionality at the pleadings stage. Dismissal in the face of genuine factual disputes over unconventional inventive features is therefore improper. *Berkheimer*, 881 F.3d 1360 at 1370.

## 6. CONCLUSION

Paradise therefore requests that this Court deny J2's Motion to Dismiss or, in the alternative, allow Paradise to further amend its pleadings.

Dated: February 4, 2021                Respectfully submitted,

*/s/ Isaac Rabicoff*
Isaac Rabicoff
**Rabicoff Law LLC**
5680 King Centre Dr, Suite 645
Alexandria, VA 22315
(773) 669-4590
isaac@rabilaw.com

**Counsel for Plaintiff
Paradise IP LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on all parties who have appeared in this case on February 4, 2021, via the Court's CM/ECF system.

*/s/ Isaac Rabicoff*
Isaac Rabicoff